UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

EDUARDO ALVARADO,

                    Plaintiff,

           - against -

JEFFREY, INC. and NORDSTROM, INC.,

                  Defendants.

-------------------------------------X

**<u>MEMORANDUM AND</u>**

**<u>ORDER</u>**

14 Civ. 500 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Eduardo Alvarado brings this action alleging racial discrimination in violation of Section 1981 of the Civil Rights Act of 1866 ("Section 1981") and racial and sexual orientation discrimination in violation of the New York State Human Rights Law ("NYHRL") and the New York City Human Rights Law ("NYCHRL"). Plaintiff specifically claims that defendants subjected him to a hostile work environment, constructively discharged him, and undertook unlawful retaliation. Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Alvarado seeks an adverse inference against defendants due to spoliation of evidence. For the reasons stated herein, plaintiff is not entitled to an adverse inference and defendants' motion is granted.[1]

---

[1] Because none of Alvarado's claims against Jeffrey survive, Alvarado's claims against Nordstrom, Inc. similarly fail.

**BACKGROUND**

Plaintiff Alvarado is a gay Hispanic man who works as a salesperson specializing in high-end fashion.  Pl. R. 56.1 Ctr. Stmt. ¶ 65.  From 2003 until July 12, 2012, Alvarado worked at the New York location of defendant Just Jeffrey, Inc. ("Jeffrey"), a department store.  Defs. R. 56.1 Stmt. ¶ 1; Pl. R. 56.1 Ctr. Stmt. ¶ 371.  Jeffrey Kalinsky founded Jeffrey, and holds the title of President.  Pl. R. 56.1 Ctr. Stmt. ¶ 69.  During the time period at issue, John Seery managed Jeffrey's New York location, id. ¶ 80, and Josh Gonzalez served as assistant store manager.  Id. ¶ 83.  Defendant Nordstrom, Inc. is a department store chain that owns 90% of Jeffrey.  Defs. R. 56.1 Stmt. ¶ 42; Pl. R. 56.1 Ctr. Stmt. ¶ 42.

Alvarado enjoyed a very successful career with Jeffrey, earning over $100,000 per year in the last two full years of his employment.  Defs. R. 56.1 Stmt. ¶¶ 7-8; Pl. R. 56.1 Ctr. Stmt. ¶¶ 7-8.  In 2011, however, Alvarado began to experience difficulties with a colleague of his, Keisha Daniel, a straight African-American woman who had recently been promoted to salesperson in the women's shoe department.  Decl. of Eduardo Alvarado in Opp. to Defs. Mot. for Summ. J. ¶ 2; Pl. R. 56.1 Ctr. Stmt. ¶¶ 32; 127.  The first documented incident occurred in March of 2011, when Daniel and Kenya Dalrymple, another straight African-American female co-worker, Defs. R. 56.1 Stmt. ¶ 32; Pl. R. 56.1 Ctr. Stmt. ¶ 32,

followed Alvarado around the sales floor.  Pl. R. 56.1 Ctr. Stmt.
¶ 32.  When Alvarado asked Daniel and Dalrymple if they planned on
following him home, they asked if he would make them arroz con
pollo, to which he responded that he would make them fried chicken
and sweet potato fries.  Defs. R. 56.1 Stmt. ¶¶ 32-33; Pl. R. 56.1
Ctr. Stmt. ¶ 32.  That same day, Daniel followed Alvarado into the
break room and called him a "miserable motherfucker."  Defs. R.
56.1 Stmt. ¶ 35; Pl. R. 56.1 Ctr. Stmt. ¶ 35.  On March 20, 2011,
Daniel posted on Facebook "I really wish that I could smack the
shit out of some coworkers and still keep my job.  It should be
okay if they really deserve it," Defs. R. 56.1 Stmt. ¶ 37; Pl. R.
56.1 Ctr. Stmt. ¶ 37, which referred to Alvarado.  Pl. R. 56.1
Ctr. Stmt. ¶ 160.  In the spring of 2011, a co-worker of Alvarado's
overheard Daniel state that "she wished Alvarado punched her" so
that he would be fired.  Pl. R. 56.1 Ctr. Stmt. ¶ 163.

Alvarado subsequently complained to Seery that Daniel called
him a "miserable motherfucker" and "follow[ed] him around the sales
floor."  Pl. R. 56.1 Ctr. Stmt. ¶ 164.  A co-worker also told Seery
that he had heard Daniel say that she wanted Alvarado to punch
her.  Osborne Decl. Ex. 10.  Seery and Gonzalez met with Daniel on
April 8, 2011 to discuss these incidents.  Pl. R. 56.1 Ctr. Stmt.
¶ 167.  The next day, Daniel told Seery and Gonzalez that Alvarado
had said he would serve her and Dalrymple fried chicken and sweet
potatoes, and that she felt that this statement was racist.  Id.

¶ 169.   Seery met with Alvarado to discuss this incident, and Alvarado mentioned that he was asked whether he would serve arroz con pollo.   Osborne Decl. Ex. 59.   Seery and Gonzalez issued a verbal warning to Alvarado for his comment that he would make Daniel fried chicken and sweet potato fries, and to Daniel for calling Alvarado "fucking miserable," saying that she wished Alvarado would punch her, and calling another employee a liar. Pl. R. 56.1 Ctr. Stmt. ¶ 36.

According to Alvarado,[2] approximately two months later on June 2, 2011, Daniel yelled at Alvarado, Jose Bravo, a gay Hispanic shoe salesperson, and manager Cara Smyth on the sales floor, because Alvarado and Bravo complained to Smyth when Daniel assisted a customer in the women's shoe section even though she had been assigned to another section of the store.  Id. ¶¶ 176-77.  Daniel "became very agitated and began yelling at Alvarado, Bravo, and Smyth" and she "was volatile and no one was able to control her." Id. ¶ 177.  As a result, Smyth asked Daniel to leave the floor in order to calm down.   Id. ¶ 178.   That evening, Daniel posted on Facebook "Calgon take me away . . . and if you can't I have a bottle of wine and a pill that can.   #stressfulwannakillmyco-workerskindofday."  Id. ¶ 182.

That evening, Daniel emailed Seery, Gonzalez, and another

---

[2] Other evidence in the record indicates that Daniel, Alvarado and Daniel argued on the sales floor prior to Smyth's intervention and that Daniel merely "mumble[d] something under her breath" to Smyth.  Osborne Decl. Ex. 13.

manager and stated that she felt "targeted and harassed" by Alvarado and Bravo. Id. ¶ 184. Daniel wrote in her email that "the steps taken to alleviate any problems [with Alvarado] have been ineffective." Osborne Decl. Ex. 12. On June 3, 2011, Seery spoke to Alvarado and Bravo regarding the allegations in Daniel's email, and Alvarado brought Daniel's Facebook posts to his attention. Pl. R. 56.1 Ctr. Stmt. ¶ 187. The next day, Seery spoke to Smyth about the dispute between Daniel, Alvarado, and Bravo. Osborne Decl. Ex. 13. On June 16, 2011, Daniel received a written reprimand for her two posts on Facebook, Defs. R. 56.1 Stmt. ¶ 39; Pl. R. 56.1 Ctr. Stmt. ¶ 39, which stated that such "behavior is unacceptable," that "there is no room for this type of behavior" at Jeffrey, and that Daniel "may be terminated if she continues to use poor judgment in her word[s] and actions and fails to participate in a healthy and positive teamwork environment." Osborne Decl. Ex. 14.

After the above incident, Seery told Alvarado that he could not easily deal with allegations of misconduct by African-American employees, because he did not want to appear racially biased. Pl. R. 56.1 Ctr. Stmt. ¶ 211. According to Alvarado, as a result of this unwillingness to discipline African-American employees, the gay, Hispanic employees were required to perform the tasks associated with the opening and closing shifts for which the

salespeople did not receive compensation.[3]  Id. ¶¶ 93-96.  At least one African-American employee, Fred Nassa, regularly performed these tasks.  Defs. R. 56.1 Stmt. ¶ 14; Pl. R. 56.1 Ctr. Stmt. ¶ 14.  Alvarado received an accommodation to take his grandmother to dialysis three days a week and did not perform these tasks on those days.  Defs. R. 56.1 Stmt. ¶ 19; Pl. R. 56.1 Ctr. Stmt. ¶ 19.

On June 18, 2011, Lamar Lawrence, an African-American co-worker, called Alvarado "a little bitch" in the midst of a dispute.  Pl. R. 56.1 Ctr. Stmt. ¶¶ 200-01.  Smyth and Gonzalez met with Lawrence and Alvarado the next day and informed Lawrence that he would receive a written reprimand for his behavior, Osborne Decl. Ex. 51, which he received on June 25, 2011.  Defs. R. 56.1 Stmt. ¶ 41; Pl. R. 56.1 Ctr. Stmt. ¶ 41.  This reprimand stated that "using vulgar language towards another co-worker . . . [is] unacceptable and . . . should never happen again," and that "[i]f this behavior continues we may take further action." Osborne Decl. Ex. 51.

On June 20, 2011, Alvarado called a Nordstrom hotline and complained about Daniel's Facebook posts, noting that he was concerned that she might attack him physically at work.  Pl. R. 56.1 Ctr. Stmt. ¶ 205.  The next day, Kalinsky, the founder and President of Jeffrey, and Seery met with Alvarado.  Id. ¶ 206.

---

[3] Defendants dispute that the African-American employees did not perform these tasks.  Defs. R. 56.1 Stmt. ¶¶ 15; 17.

After this meeting, Alvarado decided not to press his complaint further, and Nordstrom subsequently closed the complaint.  Id. ¶ 207.

No further problems arose between Alvarado and his co-workers until January of 2012, approximately six months later.  At the beginning of that month, Alvarado complained about Daniel's treatment of him to Seery.  Id. ¶ 261.  According to Alvarado, Seery replied that if Alvarado did not like it, he could leave Jeffrey.[4]  Id.

On January 18, 2012, Daniel told Alvarado that he had a message from a customer, and, after he indicated that he understood, she continued to repeat that he had received a message. Id. ¶¶ 262-63.  This incident turned into a shouting match, and co-worker Lawrence ultimately removed Daniel from the store.  Id. ¶¶ 265-67.  After the January 18, 2012 incident, Seery and Gonzalez met with Alvarado.  Id. ¶ 276.  At this meeting, Gonzalez asked Alvarado if he had touched Daniel's face during the dispute.  Id. Alvarado denied that he had, and asked Seery and Gonzalez to review a surveillance recording to confirm his account.  Id.  According to Alvarado, Jeffrey failed to preserve this recording.

Alvarado submitted a written complaint to Nordstrom on January 23, 2012 regarding his treatment by Daniel and

---

[4] Defendants dispute this characterization of Seery's statement.  See Dec. 15, 2015 Tr. at 27:22-23.

discrimination by management.  Defs. R. 56.1 Stmt. ¶ 50; Pl. R. 56.1 Ctr. Stmt. ¶ 50.  Specifically, Alvarado catalogued, <u>inter alia</u>, the incidents discussed above, but did not mention that Daniel and Dalrymple had asked if he would prepare them arroz con pollo.  Defs. R. 56.1 Stmt. ¶ 51; Pl. R. 56.1 Ctr. Stmt. ¶ 51; Osborne Decl. Ex. 6.  In response to Alvarado's complaint, a Nordstrom employee, Kelly Lane, conducted an investigation.  Defs. R. 56.1 Stmt. ¶¶ 52; 53; Pl. R. 56.1 Ctr. Stmt. ¶¶ 52; 53.  Based on her investigation, Lane determined that the evidence did not support the conclusion that Alvarado experienced discrimination at Jeffrey.  Defs. R. 56.1 Stmt. ¶ 55; Pl. R. 56.1 Ctr. Stmt. ¶ 55. On March 19, 2012, Alvarado received a written reprimand for the dispute with Daniel on January 18, 2012, as well as for a dispute with Gonzalez on January 28, 2012, during which he "raise[d] [his] voice at [Gonzalez] in a very aggressive manner . . . ."  Osborne Decl. Ex. 48.  On March 20, 2012, Daniel also received a written reprimand for the January 18 incident.  Defs. R. 56.1 Stmt. ¶ 60; Pl. R. 56.1 Ctr. Stmt. ¶ 60.

     In the spring of 2012, Kenya Dalrymple told another employee that he needed to "choose sides between the real girls or the queens."  Pl. R. 56.1 Ctr. Stmt. ¶ 153.  Around the same time, Bravo resigned from Jeffrey in order to avoid becoming "bitter." Pl. R. 56.1 Ctr. Stmt. ¶ 365.  Alvarado left Jeffrey on July 12, 2012.  Pl. R. 56.1 Ctr. Stmt. ¶ 371.

**DISCUSSION**

I.    **Summary Judgment**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material when it might affect the outcome of the suit under governing law." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  Disputes regarding facts that are not material will not forestall the entry of judgment if the moving party has properly supported its motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The district court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006) (internal quotation marks omitted).

As noted earlier, Alvarado has brought his claims of hostile work environment, constructive discharge and retaliation under federal, state and local statutes.[5]  We will address each in turn. At the outset, we resolve Alvarado's request for an adverse

---

[5] To the extent that Alvarado also brings racial and sexual orientation discrimination claims in which his hostile work environment serves as the adverse employment action, see Dec. 15, 2015 Tr. at 2:11-14 (describing claims as "hostile work environment but also hostile treatment in that the Hispanics and the gay workers were treated less well than the African-Americans"), those claims fail as Alvarado has not made out a case of hostile work environment.

inference against Jeffrey and Nordstrom.

## II.  Spoliation

Alvarado argues that Jeffrey was grossly negligent in failing to preserve surveillance video of the dispute between Alvarado and Daniel on January 18, 2012 and that he is therefore entitled to an adverse inference against Jeffrey and Nordstrom sufficient to survive summary judgment.  This argument is unavailing.

There is no evidence that "video" of the January 18, 2012 incident ever existed.  Defendants point to deposition testimony that the surveillance cameras are not trained on the area in which the January 18, 2011 incident occurred, and Alvarado's 56.1 statement does not reveal any dispute on this issue.  Without any evidence that this information existed at all, Alvarado has not shown that he is entitled to an adverse inference.  See Riddle v. Liz Claiborne, Inc., No. 00 Civ. 1374 (MBM) (HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003).

## III. Hostile Work Environment—Section 1981 and NYHRL[6]

### A.   Legal Standard

"In order to establish a claim of hostile work environment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

---

[6] Courts employ the same framework for analyzing claims under both Section 1981 and the NYHRL, and so we address these claims together throughout.  Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) (hostile work environment and constructive discharge); Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (retaliation claims).

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks and omitted).  Courts must take into account the totality of the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  The hostile work environment inquiry includes both an objective and a subjective component: "the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Harris, 510 U.S. at 21). This conduct must be motivated by the plaintiff's protected characteristic, but facially neutral incidents may support a hostile work environment claim if such conduct is motivated by discrimination.  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20, 23 (2d Cir. 2012) ("We have cautioned that a hostile work environment claim need not be supported by direct evidence of explicitly racial harassment.  Circumstantial evidence may do.").  While Section 1981 prohibits discrimination only on the basis of race, Hyunmi Son v. Reina Bijoux, Inc., 823 F. Supp.

2d 238, 242 (S.D.N.Y. 2011), the NYHRL prohibits discrimination on the basis of, _inter alia_, race and/or sexual orientation.  N.Y. Exec. Law § 296(1).

## B.  Application

Alvarado's hostile work environment claims fail because he has not put forth sufficient evidence for a reasonable jury to conclude that discriminatory incidents objectively altered the conditions of his employment by their severity or pervasiveness. In support of these claims, Alvarado points to evidence that Daniel and Dalrymple followed him in the store and asked if he would prepare arroz con pollo; that Daniel called him a "miserable motherfucker," said she wanted him to punch her so he would be fired, wrote two Facebook posts with violent overtones, and twice became enraged and agitated with Alvarado on the sales floor; that Lawrence called him a "little bitch"; that Dalrymple told a co-worker to choose between the "real girls" and the "queens"; and that he received a written reprimand for his argument with Daniel on January 18, 2012 and his dispute with Gonzalez on January 28, 2012.

From this compendium, Alvarado points to three comments with racial or sexual-orientation overtones, made over the course of approximately a year:  Daniel and Dalrymple's statement that

Alvarado would cook arroz con pollo;[7] Lawrence's statement that
Alvarado was "a little bitch"; and Dalrymple's statement to another
co-worker that he needed to "choose sides between the real girls
or the queens." With respect to Alvarado's claim under Section
1981, a single comment with ambiguously racial connotations does
not merit relief. With respect to Alvarado's NYHRL claim, the
three comments, taken as a whole, do not rise to the level of an
objective alteration of the terms and conditions of Alvarado's
employment. See Richardson v. New York States Dep't of
Correctional Serv., 180 F.3d 426, 439-40 (2d Cir. 1999) (hostile
work environment claim survives summary judgment based on ten
incidents over three and one-half years, including multiple uses
of the terms "nigger," "spooks," and "Buckwheats," but separate
hostile work environment claim fails based on three milder racially
motivated statements, which could not "suffice to create a hostile
working environment"), abrogated on other grounds by Burlington N.
& Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) ("Burlington
Northern"); see also Schwapp v. Town of Avon, 118 F.3d 106, 110
(2d Cir. 1997) ("For racist comments, slurs, and jokes to
constitute a hostile work environment, there must be 'more than a
few isolated incidents of racial enmity[.]'") (quoting Snell v.
Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)). Finally, the

---

[7] To which Alvarado responded that he would serve them fried chicken and sweet
potato fries. Defs. R. 56.1 Stmt. ¶ 33; Pl. R. 56.1 Ctr. Stmt. ¶ 33.

addition of a single reprimand, particularly where Alvarado has not shown that improper animus motivated the reprimand, see infra at 21-26, does not transform a few isolated incidents into a hostile work environment.

Alvarado argues that the context of his co-workers statements permits the inference that racial and sexual-orientation hostility motivated the facially neutral behavior of Daniel.  For instance, Daniel and Dalrymple made the "arroz con pollo" statement while following Alvarado around the store, and shortly thereafter Daniel called him a "miserable motherfucker" and berated him; Lawrence called Alvarado a "little bitch" soon after Daniel received a reprimand for her Facebook posts, and Dalrymple told a co-worker to choose between "queens" and "real girls" shortly after Alvarado complained to Nordstrom.  It is true that "prior derogatory comments by a co-worker may permit an inference that further abusive treatment by the same person was motivated by the same [unlawful bias] manifested in the earlier comments," Raniola v. Bratton, 243 F.3d 610, 622 (2d Cir. 2001), but courts have only so found where the statements evidencing bias were unambiguous epithets of a severity greater than the single comment by Daniel and Dalrymple that Alvarado would serve them "arroz con pollo." See Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (co-worker made "obscene comments [including calling plaintiff "cunt"] . . . at length, loudly, and in a large group" of

subordinates).  Relatedly, that Lawrence called Alvarado a "little bitch" does not imply that sexual orientation animus motivated Daniel's prior acts, and Alvarado does not even connect Dalrymple's statement to any further conduct whatsoever.

Alvarado also argues that the fact that Daniel did not get along with Alvarado, Bravo, and Oswaldo Manrique, all Hispanic co-workers, permits an inference of discrimination.  This argument is unavailing.  Numerous Hispanic and gay employees worked at Jeffrey; that Daniel did not get along with two such employees does not qualify as even circumstantial evidence of discrimination. Further, Alvarado has introduced evidence that Daniel did not get along with multiple co-workers, such as Fred Nassa, a straight African-American man, Pl. R. 56.1 Ctr. Stmt. ¶ 117, and Marjorie Hampton, id. ¶ 133, a straight African-American woman.  Osborne Decl. Ex. 1 at 131:6-10.  That some of the people Daniel did not get along with included gay, Hispanic co-workers does not permit an inference of discrimination.

Based on the record presented, it appears that Daniel was a trying co-worker.  However, her strong personality, which manifested itself in many contexts apart from her interactions with Alvarado, does not rise to the level of a hostile work environment.[8]

---

[8] Because Alvarado has not shown that he experienced a hostile work environment, his claims that defendants failed to remediate the hostile work environment, and should therefore be held liable, must fail.  See Richardson v. Suffolk Bus

**IV.  Constructive Discharge—Section 1981 and NYHRL**

**A.  Legal Standard**

In order to state a claim for constructive discharge, the plaintiff must show that his or her "employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Ferraro v. Kellwood Co, 440 F.3d 96, 101 (2d Cir. 2006) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)).  Whether the working conditions were so intolerable that an employee was compelled to resign is an objective inquiry. Petrosino v. Bell Atl., 385 F.3d 210, 230 (2d Cir. 2004).

**B.  Application**

Alvarado has not shown that Jeffrey constructively discharged him, because he has not put forth evidence that Jeffrey deliberately and discriminatorily created hostile, much less intolerable, work conditions.  Alvarado predicates his constructive discharge claim on the allegedly hostile work environment, Jeffrey's allegedly ineffective response thereto, and Seery's statement, in response to Alvarado's complaint that Daniel spoke to him in an unprofessional tone of voice, that if he did not like it, he could leave.  Alvarado cannot sustain a constructive discharge claim where, as here, his hostile work

---

Corp., No. 09-CV-3586 (JFB) (ARL), 2010 WL 2606266, at *10 (E.D.N.Y. June 22, 2010) (no employer liability for acts of co-workers where plaintiff failed to demonstrate that co-workers created a hostile work environment).

environment claim has failed.  See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) ("Because [plaintiff] failed to establish a hostile work environment, her claim of constructive discharge also fails.").  A statement that Alvarado could leave if he did not like a co-worker's unprofessional tone is simply too mild, even when combined with the acts Alvarado offers in support of his hostile work environment claims, to survive summary judgment.

**V.   Retaliation—Section 1981 and NYHRL**

   **A.   Legal Standard**

   A court analyzes a retaliation claim by applying a three-step burden shifting framework.  Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010).  "First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Id. (internal quotation marks omitted).  "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"  Littlejohn v.

<u>City of New York</u>, 795 F.3d 297, 319 (2d Cir. 2015) (quoting <u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir.2000)).

If the plaintiff makes a <u>prima facie</u> case, the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005). "[O]nce an employer offers such proof, the presumption of retaliation dissipates," <u>id.</u>, and the employee must show that retaliation was the but-for cause of the adverse employment action. <u>Univ. of Tex. Sw. Med. Ctr. V. Nassar</u>, 133 S.Ct. 2517, 2528 (2013).

**B.    Application**

Alvarado's claims for retaliation under Section 1981 and the NYHRL fail because Alvarado has failed to raise a genuine issue as to whether he suffered an adverse employment action, the but-for cause of which was retaliation.

1.    <u>Adverse Employment Action</u>

Defendants do not dispute, for the purposes of this motion, that Alvarado's written complaint to Nordstrom qualifies as a protected activity or that Jeffrey knew about it.  Rather, defendants contend that Alvarado did not suffer an adverse employment action.  Alvarado, in support of his retaliation claim, argues that Jeffrey failed to remediate the hostile work environment, considered firing Alvarado, believed he should leave Jeffrey, gave him a written warning, and documented interactions

18

with him.

In order to show that he suffered an adverse employment action, Alvarado "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 68 (internal quotation marks omitted). Most of Alvarado's suggested adverse employment actions do not rise to the level of material adversity, but the written reprimand he received does fit within the definition.

Alvarado's argument that "Jeffrey's failure to alleviate the increasingly hostile work environment is a retaliatory adverse action," Pl. Mem. of Law in Opp. to Defs. Mot. for Summ. J. ("Pl. Opp.") at 22, is unavailing, because Alvarado's hostile work environment claims fail. In addition, the two incidents that, according to Alvarado, demonstrate a deteriorating work environment after he filed his written complaint do not show that <u>Jeffrey</u> took any action with respect to <u>Alvarado</u>. A colleague, Dalrymple, told another colleague that he needed to "choose sides between the real girls or the queens," Pl. R. 56.1 Ctr. Stmt. ¶ 153, and Bravo, a gay, Hispanic man, left Jeffrey in order to avoid becoming "bitter." <u>Id.</u> ¶ 365. With respect to Dalrymple's comment, Dalrymple is a co-worker, and Alvarado has presented no evidence that management at Jeffrey ever knew about the comment.

With respect to Bravo's resignation, such an action could not possibly support a claim that Jeffrey retaliated against Alvarado.

Alvarado also argues that Jeffrey retaliated against Alvarado by 1) contemplating terminating him; 2) "believ[ing] Alvarado should leave if he did not like the work environment; 3) documenting interactions with Alvarado; and 4) doing nothing in response to Alvarado's fear of a physical attack by Daniel. Pl. Opp. at 22. With respect to the first three allegations, Alvarado presents no evidence that he even knew when he worked at Jeffrey that management considered terminating him, believed he should leave, or documented interactions with him. With respect to the fourth allegation, an insufficient response to a complaint cannot provide the basis for a retaliation claim where the complaint itself is the protected activity alleged by plaintiff. See Fincher, 604 F.3d at 721 ("An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint . . . .").

Only Alvarado's written reprimand may constitute an adverse employment action for the purpose of his retaliation claim. While defendants argue that the issuance of a reprimand cannot qualify as an adverse employment action, the Second Circuit has squarely rejected this argument. See Millea v. Metro-North R.R. Co., 658 F.3d 154, 165 (2d Cir. 2011) (applying Burlington Northern to Family Medical Leave Act claim of retaliation and holding that "a

reasonable jury could decide . . . that a letter of reprimand would deter a reasonable employee from exercising his . . . rights"). As Alvarado has presented sufficient evidence that he suffered an adverse employment action, and given the temporal proximity of Alvarado's protected activity, an inference of discrimination at the prima facie stage arises, and so we now turn to whether a reasonable jury could conclude that Jeffrey's stated justifications are merely pretexts for retaliation.

2.    Pretext

Alvarado argues that direct evidence of retaliatory intent and disparate treatment of Alvarado both show pretext. These arguments are unavailing.

Alvarado points to statements made by store founder Kalinsky, store manager Seery, and assistant store manager Gonzalez that he contends provide direct evidence of retaliatory animus. During his deposition, Kalinsky stated that Alvarado's written complaint "sound[ed] like a prelude" to Alvarado's lawsuit, Osborne Decl. Ex. 3 at 142:9-11; 14-15, that it would have "cross[ed] [his] mind that . . . this was a prelude for a lawsuit," and that "it would not surprise [him] if [he] didn't [sic] say to [Seery] that [Alvarado] [was] gearing up for a lawsuit." Osborne Decl. Ex. 3 at 157:2-4; 8-10. However, while "evidence of an employer's anger at its employee for engaging in a protected activity may well constitute direct causal evidence," Delville v. Firmenich Inc.,

21

920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013), a belief that an employee may file a suit does not amount to anger sufficient to permit an inference of retaliatory animus. Further, Alvarado presents no evidence that Kalinsky had any involvement whatsoever with his reprimand. Indeed, Alvarado introduces evidence that suggests the opposite: Kalinsky did not know that Alvarado has received a reprimand, nor did he know that Nordstrom had helped prepare it. Pl. R. 56.1 Ctr. Stmt. ¶¶ 339-40.

As additional evidence that his reprimand was driven by retaliation, Alvarado points to Seery's statement that Alvarado could leave if he didn't like Daniel's treatment of him. However, Seery made this comment before Alvarado filed his written complaint, and so cannot provide evidence of retaliatory animus. Finally, Alvarado identifies as evidence of retaliatory animus Gonzalez's statement to Lane, a Nordstrom employee investigating Alvarado's complaint, that Seery "took [Alvarado's complaint] too personally . . . ." Id. ¶ 344. However, Gonzalez further stated that this reaction in fact caused Seery not to provide Alvarado with a written reprimand until receiving direction from Nordstrom, because he did not "want to inflame the situation." Id. This statement, therefore, does not support the proposition that Seery acted in order to retaliate against Alvarado.

Nor has Alvarado provided indirect evidence that Jeffrey's non-retaliatory reasons for issuing the written reprimand are

pretextual.    In order to do so under a disparate treatment analysis, Alvarado must proffer evidence that he is "similarly situated in all material respects" to Daniel, his chosen comparator.  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).  This standard requires, inter alia, "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000).

Jeffrey has put forth two reasons for the reprimand: on January 18, 2012, Alvarado argued with Daniel on the sales floor and on January 28, 2012, Alvarado raised his "voice at [Gonzalez] in a very aggressive manner while pointing [his] thumb towards [Gonzalez], after [Gonzalez] asked [Alvarado] several times to calm down and not raise [his] voice . . . ."  Osborne Decl. Ex. 48.  Jeffrey further notes that Daniel also received a reprimand for the argument on January 18, 2012, which, Jeffrey argues, shows that retaliation did not play a role in the reprimand.  Alvarado contends that each reason is pretextual: Daniel's behavior merited more punishment than Alvarado with respect to the January 18, 2012 incident and, with respect to the January 28, 2012 incident, Daniel frequently exhibited insubordinate behavior without punishment. Neither of Alvarado's arguments is persuasive.

With respect to the January 18 incident, Alvarado does not introduce evidence that Daniel in fact acted in a more extreme fashion than Alvarado did.    Rather, he points to deposition testimony that indicates that Daniel became "agitated and volatile," Pl. R. 56.1 Ctr. Stmt. ¶ 265, shouted more loudly than Alvarado during the dispute, moved her arms "up and down," id. ¶ 267, and that Lawrence removed Daniel from the store "before anything possible escalated," because "it just looked like the situation was about to get worse . . . ."    Id. ¶ 266.    In comparison, Alvarado shouted back at Daniel and tried to wave her away.    See Id. ¶¶ 266-67.    No reasonable jury could find that Daniel's behavior was so much worse than Alvarado's that receipt of the same punishment would give rise to an inference of retaliation.    Courts cannot require employers to make such fine distinctions in meting out reprimands.

With respect to the January 28 incident, Alvarado argues that in the past Daniel had frequently acted in an insubordinate fashion and did not receive a reprimand for that behavior.    Specifically, Alvarado points to evidence that Daniel did not stop leaning on a couch when a manager asked her to do so, shouted at Smyth on the sales floor, lied to Seery about eating an apple in the break room, and accused Marjorie Hampton, a manager, of pushing her on the stairs, without punishment of any kind.    See Pl. R. 56.1 Ctr. Stmt. ¶ 58.    With respect to this last comparison, Alvarado implies that

Daniel lied about this interaction and that Jeffrey should have known that she lied. As support for this proposition, Alvarado points to Kalinsky's deposition testimony, in which he stated that "Ms. Hampton would never push anybody down the stairs." Osborne Decl. Ex. 3 at 113:11-12.

Of these incidents, only the altercation with Smyth is at all comparable. Daniel's refusal to stop leaning on a couch and her lie about eating an apple in the break room are clearly offenses of lesser seriousness. Alvarado's implication that Daniel lied about her interaction with Hampton and that Jeffrey should have known that she lied is not borne out by the record. Looking at the evidence in the light most favorable to Alvarado, Daniel accused Hampton of "push[ing] like at [Daniel's] stomach." By contrast, Kalinsky testified that that "Ms. Hampton would never push anybody down the stairs." Osborne Decl Ex. 3 at 113:11-12 (emphasis added). That Kalinsky would not believe a much more serious accusation against Hampton does not suggest that Daniel lied about — or that Jeffrey should have suspected she lied about — the actual, more minor charge.[9] Further, Hampton admitted that she had in fact touched Daniel while they were on the stairs. See Osborne Decl. Ex. 17 (Hampton "stated that [Daniel] was moving

---

[9] The record also suggests — though we do not find — that at the time of the incident, Daniel accused Hampton only of "put[ing] her hands" on Daniel, an even less serious accusation. Osborne Decl. Ex. 17.

very quickly and that she merely extended her arm and [Daniel] ran into it.").

Assuming that Daniel's interaction with Smyth occurred in the way Alvarado describes it, this dispute does provide an appropriate comparison to Alvarado's altercation with Gonzalez. However, the record does not support a reasonable inference that Seery, the manager "responsible for determining whether an employee should receive a written reprimand for insubordination," Pl. R. 56.1 Ctr. Stmt. ¶ 252, knew that Daniel shouted at Smyth on the sales floor. In the document that Alvarado cites for the proposition that Seery knew about this dispute, see Pl. R. 56.1 Ctr. Stmt. ¶ 171; Osborne Ex. 13, Smyth describes the event as one in which Daniel "mumble[d] something under her breath." Osborne Decl. 13. Because Alvarado has not shown that Seery ever learned of behavior comparable to raising one's voice in an aggressive manner, he has not demonstrated that the reason given for his reprimand is a pretext for retaliation. Cf. Cruz v. Coach Stores, Inc., 202 F.3d 560, 568 (2d Cir. 2000) (no demonstration of pretext for discrimination in connection with a fight where plaintiff produced no evidence that her employer believed her to be acting in self-defense).

## VI.   NYCHRL

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination

26

plaintiffs, to the extent that such a construction is reasonably possible.'" Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (quoting Albunio v. City of New York, 947 N.E. 2d 135, 137, 16 N.Y.3d 472, 477-78 (2011)).

A plaintiff can hold an employer liable under the NYCHRL in three circumstances:

> (1) where the offending employee "exercised managerial or supervisory responsibility" . . . ; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take "immediate and appropriate corrective action"; and (3) where the employer "should have known" of the offending employee's unlawful discriminatory conduct yet "failed to exercise reasonable diligence to prevent [it]."

Zakrzewska v. New School, 928 N.E.2d 1035, 1039, 14 N.Y.3d 469, 479 (2010) (alteration in original) (quoting N.Y.C. Admin. Code 8-107(13)(b)).

### A.    Discrimination/Hostile Work Environment

Under the NYCHRL, a plaintiff must show that he was treated less well than other employees because of his protected status. See Mihalik, 715 F.3d at 110. A plaintiff need not show that the discriminatory treatment he or she received was either severe or pervasive. Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 76, 872 N.Y.S.2d 27, 38 (1st Dep't 2009). However, "defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial

inconveniences." Id. at 80, 872 N.Y.S.2d at 41 (internal quotation marks omitted).

Alvarado's NYCHRL discrimination claim cannot survive summary judgment. As discussed earlier, supra at 12-15, of the incidents that form the basis of Alvarado's hostile work environment claim under Section 1981 and the NYHRL, only the three statements by co-workers Daniel, Lawrence and Dalrymple evince any racial or sexual orientation hostility. These comments can only be interpreted as petty slights and trivial inconveniences. See Kaur v. N.Y.C. Health & Hospitals Corp., 688 F. Supp. 2d 317, 338, 340 (S.D.N.Y. 2010) (two "obviously racist" comments by supervisors merely petty slights and trivial inconveniences). While even a single comment may be actionable where, for instance, under the circumstances it "singal[s] views about the role of [members of the protected class] in the workplace," Williams, 61 A.D.3d at 80 n.30, 872 N.Y.S.2d at 41 n.30, the statements at issue are insufficiently serious for Alvarado's claim to survive summary judgment.

Even if the statements of Lawrence and Dalrymple are considered more serious and potentially actionable, liability cannot lie against defendants. Smyth and Gonzalez met with Alvarado and Lawrence the day after Lawrence called him a "bitch," gave Lawrence a verbal reprimand, and told him he would subsequently receive a written reprimand. Seery and Gonzalez then issued a written reprimand to Lawrence, and Alvarado reported no

28

further discriminatory comments of any kind by Lawrence. Upon learning of Lawrence's comment, Jeffrey took "immediate and appropriate corrective action." N.Y.C. Admin. Code § 8-107(13)(b)(2). With respect to Dalrymple's comment that an employee needed to "choose sides between the real girls or the queens," Alvarado presents no evidence that any manager at Jeffrey even knew that Dalrymple had made this comment. Therefore, even assuming that such a statement is actionable, Jeffrey cannot be held liable, as Alvarado has put forth no evidence that Jeffrey should have known that Dalrymple had made such a statement.

Alvarado also contends that the failure of Jeffrey to discipline African-American employees for failing to perform duties associated with opening and closing the store is evidence of disparate treatment. However, Alvarado has failed to put forth sufficient evidence for a reasonable jury to find that Jeffrey treated Alvarado less well in this regard because of his race or sexual orientation. While at least one African-American employee, Fred Nassa, did perform such tasks, Alvarado argues that this fact should be discounted, as Nassa never objected to such work. However, Alvarado also received permission to avoid these tasks, and he has not put forth any evidence that members of other groups were disciplined for similarly declining to engage in such duties.

**B.  Retaliation**

In order to make out a case of retaliation under the NYCHRL,

the plaintiff must show that he "took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112 (citation omitted).  For retaliation claims, "no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity.'" Williams, 61 A.D.3d at 71, 872 N.Y.S.2d at 34 (quoting N.Y.C. Admin. Code § 8-107(7)).  The NYCHRL, unlike the standard under federal and state law, does not have a materiality requirement.  Id. n.12.  Where a defendant puts forth a legitimate, non-retaliatory basis for the action at issue, summary judgment is appropriate "only if the record establishes as a matter of law that discrimination play[ed] no role in its actions." Mihalik, 715 F.3d at 110 n.8 (alterations and emphasis in original and internal quotation marks omitted).

As outlined above, see supra at 21-26, Alvarado has not, aside from the temporal proximity between his protected activity and his written reprimand, raised any inference of discrimination. Temporal proximity alone is insufficient to sustain a retaliation claim under the NYCHRL once a defendant has put forth a legitimate, non-retaliatory reason for the adverse employment action suffered by a plaintiff.  See E.E.O.C. v. Bloomberg, 967 F. Supp. 2d 816,

862 (S.D.N.Y. 2013).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in its entirety.  This Memorandum and Order resolves Docket No. 30.  The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:    New York, New York
          March 3, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

31